## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

Estate of Jeffrey H. Ware, By Barbara Boyer, Individually,  )
On Behalf of Wrongful Death Beneficiaries and as  )
Administratrix of Estate of Jeffrey H. Ware  )
        VS.  )
Hospital of the University of Pennsylvania,  and  )
University of Pennsylvania, and Perelman School of Medicine  )
University of Pennsylvania, and Trustees of the University of  ) Case No. 14-cv-00014
Pennsylvania, and Ann R. Kennedy, D.S.C. and  )
Gary Kao, M.D. and Michelle Alonso-Basanta, M.D., and  )
National Space Biomedical Research Institute and  )
Center for Acute Radiation Research  )

## O R D E R

AND NOW, this _____ day of _____, 2014, upon

consideration of the Plaintiff's Motion for Remand and the Response  of Defendants National

Space Biomedical Research Institute and Center for Acute Radiation and Defendants' Joinder in

the Response filed by co-defendants  Hospital of the University of Pennsylvania et al,  it is

hereby ORDERED AND DECREED that said Plaintiff's Motion for Remand is **DENIED**.


_____
U.S.D.C., J

1147873_1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ESTATE OF JEFFREY H. WARE,<br>by BARBARA BOYER, Individually,<br>on behalf of Wrongful Death beneficiaries and<br>as Administratrix of the ESTATE of<br>JEFFREY H WARE<br>**Plaintiff** | **CIVIL ACTION**<br><br>**NO. 14-00014** |

**v.**

**HOSPITAL OF THE UNIVERSITY
OF PENNSYLVANIA, ET AL.
Defendants**

## ANSWER OF DEFENDANTS NATIONAL SPACE BIOMEDICAL RESEARCH INSTITUTE AND CENTER FOR ACUTE RADIATION RESEARCH TO PLAINTIFF'S MOTION FOR REMAND

Defendants National Space Biomedical Research Institute (NSBRI) and Center for Acute Radiation Research (CARR)[1], by and through counsel, German, Gallagher & Murtagh, P.C., hereby respond to Plaintiff's Motion for Remand stating as follows:

1. Admitted.

2. Admitted in part. Denied in part. It is admitted on information and belief that Dr. Jeffrey Ware was employed as a researcher at the University of Pennsylvania for a period of time. It is further admitted that Dr. Ware died on October 23, 2011. Defendants NSBRI and CARR are without knowledge or information sufficient to form a belief as to the truth or accuracy of the allegations concerning Dr. Ware's cause of death. The remaining allegations are denied.

---

[1] The Center for Acute Radiation Research is not an entity. All rights are reserved to seek dismissal of CARR as a defendant in this action based on matters outside the Complaint.

3.     Denied.  It is admitted only that Plaintiff made certain allegations directed to some or all of the Defendants in the Complaint.  Defendants NSBRI and CARR specifically deny allegations that NSBRI and/or CARR concealed or withheld documents and data related to Dr. Ware's exposure to radiation, exploited Dr. Ware by turning him into a research subject or enrolled him in any experimental study.

4.     Denied. It is specifically denied that NSBRI and/or CARR engaged in reckless or fraudulent conduct or that Plaintiff has a basis for an action against NSBRI and/or CARR for compensatory or punitive damages.

5.     It is admitted that on January 2, 2014, Defendants filed a Notice of Removal. The Notice of Removal is in writing and speaks for itself.

6.     The allegations in this paragraph constitute conclusions of law.  Further, Defendants have shown that removal is appropriate in the Notice of Removal and in the Memoranda of Law in support of Defendants' Responses to Plaintiff's Motion for Remand.

7.     Denied.  Defendants have met the requirements for removal.  Defendants incorporate herein the Notice of Removal and Affidavits, Exhibits and Memoranda of Law in Support of Defendants' Responses to Plaintiff's Motion for Remand.

8.     It is denied that none of Defendants' bases for removal is valid.  Defendants incorporate herein the Notice of Removal, Affidavits, Exhibits and Memoranda of Law in Support of Defendants' Responses to Plaintiff's Motion for Remand.

9. through 11. Defendants NSBRI and CARR incorporate herein by reference the Response of Defendants Hospital of the University of Pennsylvania et al to these paragraphs.

12.     It is admitted that 28 U.S.C. § 1442(a)(1) provides as follows:

§ 1442.  Federal officers or agencies sued or prosecuted

(a) A civil action or criminal prosecution that is commenced in a State court and that is directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of revenue.

13.     It is admitted that in *Feidt v. Owens Corning Fiberglass Corp.,* 153 F. 3d 124, 127 (3d Cir. 1998), citing *Mesa v. California*, 489 U.S. 121, 129, 109 S.Ct. 959, 965, 103 L.Ed 2d 99 (1989); *Willingham v. Morgan*, 395 U.S. 402, 409, 89 S. Ct. 1813, 1817, 23 L.Ed. 2d 396 (1969), the Court stated that to establish removal jurisdiction pursuant to section 1442(a)(1), defendant must establish that (1) it is a "person" within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct "acting under" a federal officer; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under the color of a federal office.

14.     Admitted.

15.     Admitted in part. Denied in part. It is admitted that NSBRI is a non-profit entity and that it is governed by a consortium of 12 institutions. The remaining allegations are denied as conclusions of law.

16.     Denied. Defendants NSBRI and CARR incorporate herein by reference the Affidavit of Jeffrey P. Sutton, M.D., Ph.D. with exhibits and the Memorandum of Law in Support of their Response to Plaintiff's Motion for Remand.

17.    Denied. The allegations contained in this paragraph are conclusions of law. By way of further answer, Defendants NSBRI and CARR incorporate herein by reference the Memorandum of Law in Support of their Response to Plaintiff's Motion for Remand.

18. through 21.    Defendants NSBRI and CARR incorporate herein by reference the Response of Defendants Hospital of the University of Pennsylvania et al to these paragraphs.

22.    Denied. Defendants NSBRI and CARR incorporate herein by reference the Response of Defendants Hospital of the University of Pennsylvania et al to this paragraph and Defendants NSBRI and CARR's Memorandum of Law in Support of their Response to Plaintiff's Motion for Remand.

WHEREFORE, Defendants NSBRI and CARR respectfully request that Plaintiff's Motion for Remand be denied.

Respectfully submitted,

GERMAN, GALLAGHER & MURTAGH, P.C.


By:   *s/ Kathryn A. Dux*
       Dean F. Murtagh, Esquire
       Attorney ID No. 19611
       Kathryn A. Dux, Esquire
       Attorney ID No. 38446
    200 S. Broad Street, Suite 500
    Philadelphia, PA 19102
    (215) 545-7700 (215) 732-4182 (Facsimile)
    Attorney for Defendants National Space
    Biomedical Research Institute and Center for
    Acute Radiation Research

| | |
|---|---|
| ESTATE OF JEFFREY H. WARE, by BARBARA BOYER, Individually, on behalf of Wrongful Death beneficiaries and as Administratrix of the ESTATE of JEFFREY H WARE **Plaintiff** | CIVIL ACTION<br><br>NO. 14-00014 |
| v. | |
| HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA, ET AL. **Defendants** | |

### MEMORANDUM OF LAW OF DEFENDANTS NSBRI AND CARR IN OPPOSITION TO PLAINTIFF'S MOTION FOR REMAND

## I.   PROCEDURAL BACKGROUND

Plaintiff, Estate of Jeffrey H. Ware by Barbara Boyer, Individually, on behalf of

Wrongful Death Beneficiaries and as Adminstratrix of the Estate of Jeffrey H. Ware (Plaintiff)

filed a Complaint in the Court of Common Pleas of Philadelphia County on December 3, 2013.

The defendants identified in the Complaint include the National Space Biomedical Research

Institute (NSBRI) and the Center for Acute Radiation Research (CARR)[1].

Plaintiff alleges in the Complaint that her husband, Dr. Jeffrey Ware, was a researcher in

the radiation oncology department at the University of Pennsylvania's Perelman School of

Medicine until he died on October 23, 2011 of malignant brain cancer caused by excessive

radiation-exposure.  Complaint, ¶ 5, 25.  Plaintiff further alleges that Defendant NSBRI works

collaboratively with the National Aeronautics Space Administration (NASA) and sponsors

research that is an integral part of NASA's Human Research Program (HRP).  Complaint, ¶35-

---

[1] CARR is alleged to be a subsidiary or corporate sub-entity of NSBRI.  However, CARR is not an entity.

36.  Plaintiff states that in 2008, the University of Pennsylvania (Penn) was awarded a $10 million grant from NSBRI to study the acute effects of space radiation.  Complaint, ¶ 33. Plaintiff further states that the $10 million grant established a Center of Acute Radiation Research (CARR).  Complaint, ¶39.  Plaintiff contends, inter alia, that Dr. Ware was a researcher on the study and that his work involved the use of equipment not paid for by the NSBRI grant, including a cesium irradiator.  Complaint, ¶ 50, 62.

The Complaint includes two counts specifically addressed to NSBRI and CARR:  Count Sixteen: Negligence and Count Seventeen: Fraud.  In Count Sixteen, Plaintiff claims that NSBRI and CARR asserted significant direct oversight over the research activities in the lab and owed Dr. Ware a duty of care to assure that all proper radiation precautions were taken to protect his safety and well-being.  In Count Seventeen, Plaintiff claims that NSBRI and CARR willfully concealed, withheld and refused to identify and produce all data and information about Dr. Ware's exposure to radiation during his years as a research scientist working at Penn.  Plaintiff alleges that "plaintiffs have specifically requested individual dosimeter data for Dr. Ware's as well as other radiation monitoring data relating to Dr. Ware's radiation exposures but Defendant has refused and has failed to produce this information.  Complaint ¶ 319.  Plaintiff claims that if the information had been provided in a "timely manner", it would have led to an earlier diagnosis and treatment of brain cancer.  Complaint, ¶ 322.

Counts Eighteen, Nineteen and Twenty for Negligent Infliction of Emotional Distress are directed to all defendants.

Plaintiff seeks compensatory and punitive damages against Defendants NSBRI and CARR.

2

The action was removed to this Honorable Court by Notice of Removal filed by all defendants on January 2, 2014. The bases for removal jurisdiction included the Atomic Energy Act of 1954, 42 U.S.C. §2201, et seq., as amended by the Price Anderson Act and the Price Anderson Amendments Act, and specifically 42 U.S.C. §2210(n)(2)(1988). Defendant NSBRI also removed the action pursuant to 28 U.S.C. § 1442(a)(1).

On January 27, 2014, Plaintiff filed a Motion for Remand of this action challenging all of the grounds raised in Defendants' Notice of Removal.

## II.     JOINDER IN RESPONSE OF CO-DEFENDANTS

Defendants NSBRI and CARR join in and incorporate by reference the Response to Plaintiff's Motion for Remand with Memorandum of Points and Authorities in Support filed by Defendants Hospital of the University of PA, University of PA, Perelman School of Medicine University of PA, Trustees of the University of PA, Ann R. Kennedy, D.S.C., Gary Kao, M.D. and Michelle Alonso-Basanta, M.D.

As set forth in co-defendants' Response to Plaintiff's Motion for Remand, the cesium irradiator referred to in Plaintiff's Complaint is a device using Cesium-137 to expose mice and ferrets to various amounts of radiation for research purposes. Plaintiff's allegation that Dr. Ware suffered bodily harm from the radioactive properties of Cesium-137 makes this case a Public Liability Action (PLA) pursuant to the Price-Anderson Act because Cesium-137 is "byproduct material." *Dumontier v. Schlumberger Tech.*, No. CV 04-16-BLG-RFC (D. Mont. September 2005); affirmed, 543 F.3d 567 (9th Cir. 2008), cert denied, 555 U.S. 1172, 129 S. Ct. 1329, 173 L. Ed.2d 586 (2009). See also, *Controneo v. Shaw Environment & Infrastructure, Inc.*, 639 F.3d 186 (5th Cir. 2011)(Bodily injury claims of subcontractors at Texas work site exposed to cesium-

137 and americium-241 while cleaning up radioactive material at a former nuclear source fabrication facility were deemed to arise under federal law by virtue of the Price Anderson Act.)

There is nothing in the language of the Act to support Plaintiff's position that it only applies to the release of radiation from a federally-licensed power plant. *In re TMI Metro. Edison Co.*, 67 F.3d 1119 (3rd Cir. 1995)("By now, 'it is axiomatic that statutory interpretation begins with the language of the statute itself.' *Government of Virgin Islands v. Knight*, 989 F.2d 619, 633 (3d Cir. 1993) (citing *Pennsylvania Dep't. of Pub. Welfare v. Davenport*, 495 U.S. 552, 557-58, 109 L. Ed. 2d 588, 110 S. Ct. 2126 (1990)). 'Courts presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use, and if the statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive.' *Id.*")

As set forth in co-defendants' Memorandum of Law, the Act has been applied in other contexts. See also, *Radiation Sterilizers v. United States*, 867 F. Supp. 1465 (E.D. Wash. 1994)(Private corporation in the business of using radiation to sterilize consumer goods brought suit when cesium capsules leased from the Department of Energy leaked on its property. The leak of the cesium capsule at the private corporation's facility was determined to be a nuclear incident under the Price Anderson Act because it was an occurrence causing loss of or damage to property, or loss of use of property, resulting from the hazardous properties of byproduct material.)

Plaintiff's reliance on *Gilberg v. Stepan Co., 24 F.Supp. 2d 325 (D. NJ 1998)* is not persuasive. In *Carey v. Kerr-McGee Corp.*, 60 F. Supp. 2d 800 (N.D. Ill. 1999), the Court analyzed the *Gilberg* opinion and identified its flaws and found it at odds with Congress' intent.

## III.    FACTS IN SUPPORT OF REMOVAL PURSUANT TO 28 U.S.C. § 1442(a)(1)

Defendant NSBRI set forth facts in the Notice of Removal which are confirmed and

supplemented for this response with the Affidavit of Jeffrey p. Sutton, M.D., Ph.D., the

President, Chief Executive Officer and Institute Director of NSBRI, and documents attached to

the Affidavit.[2]

### A.    The Cooperative Agreement and Management Plan

The Affidavit and supplemental documents establish that NSBRI was created in 1997 by

the National Aeronautics and Space Administration (NASA) pursuant to a Cooperative

Agreement awarded under 42 U.S.C. 2473 (c)(5).[3]    NASA was established by the National

Aeronautics and Space Act of 1958, as amended.  42 U.S.C. §2451 (c) ("The Congress declares

that the general welfare of the United States requires that the National Aeronautics and Space

Administration (as established by title II of this Act) seek and encourage, to the maximum extent

possible, the fullest commercial use of space.")(repealed); presently found at 51 USCS § 20111

(There is established the National Aeronautics and Space Administration. The Administration

shall be headed by an Administrator, who shall be appointed from civilian life by the President

by and with the advice and consent of the Senate. Under the supervision and direction of the

---

[2] The Court may review extra-complaint evidence in weighing the merits of Plaintiff's Motion for Remand.  See, Hagen v. Benjamin Foster Co., 739 F. Supp. 2d 770, fn. 3 (E.D. PA. 2010); Bennett v. MIS Corp., 607 F.3d 1076, fn.11 (6th Cir. 2010).

[3] Presently found at: 51 USCS § 20113. § 20113. Powers of the Administration in performance of functions.
(e) Contracts, leases, and agreements. In the performance of its functions, the Administration is authorized, without regard to subsections (a) and (b) of section 3324 of title 31 [31 USCS § 3324], to enter into and perform such contracts, leases, cooperative agreements, or other transactions as may be necessary in the conduct of its work and on such terms as it may deem appropriate, with any agency or instrumentality of the United States, or with any State, territory, or possession, or with any political subdivision thereof, or with any person, firm, association, corporation, or educational institution. To the maximum extent practicable and consistent with the accomplishment of the purpose of this chapter [51 USCS §§ 20101 et seq.], such contracts, leases, agreements, and other transactions shall be allocated by the Administrator in a manner which will enable small-business concerns to participate equitably and proportionately in the conduct of the work of the Administration.

President, the Administrator shall be responsible for the exercise of all powers and the discharge of all duties of the Administration and shall have authority and control over all personnel and activities thereof.)

The Cooperative Agreement was extended for subsequent five year periods. Exh. B, October 1, 2007 to September 30, 2012 extension. The scope of work under the Cooperative Agreement is detailed in the NSBRI Management Plan which states that NASA and NSBRI will have continuous significant interaction and pursue the Mission and Objectives that have been specified by NASA. Exh. B, ¶ 13, Exh.C, Management Plan. The NSBRI's Mission is set forth in the Cooperative Agreement and Management Plan as follows:

> 'The Mission of the Institute will be to lead a National effort for accomplishing the integrated, critical path, biomedical research necessary to support the long term human presence, development, and exploration of space and to enhance the Earth by applying the resultant advances in human knowledge and technology acquired through living and working in space. The Institute will be the focal point of NASA sponsored space biomedical research.'

Exh. C, ¶3.

There is a NASA Technical Officer authorized to represent NASA in discussions regarding NSBRI activities and to approve or disapprove NSBRI reports or technical information submitted to NASA (Exh. B, ¶ 24). Senior NASA representatives including the NASA Technical Officer are a part of the NASA/NSBRI Steering Committee that meets on a monthly basis to discuss NASA-NSBRI activities and coordination.

B.    NSBRI Consortium Institutions

NSBRI is governed by a consortium of 12 institutions. The NSBRI consortium originally consisted of seven institutions; five additional members were added in September 1999, including the University of Pennsylvania Health System. See, Affidavit J. Sutton.

C.    NSBRI Safety and Health Plan

In 1997, NASA and NSBRI agreed upon a NSBRI Safety and Health Plan which was consistent with applicable NASA requirements, as well as applicable federal, state and local regulations.  Exh. D.  The NSBRI Safety and Health Plan, approved by NASA and NSBRI, provides, among other requirements, that the Consortium Institutions or selected NSBRI affiliates are responsible for the management of all research at their respective locations; are responsible for evaluation of research activities; are required to evaluate at least annually all activities related to health and safety at their respective institutions; are required to make all safety and health documentation available for inspection or audit at the Government's request, and are required to participate in the review and modification of safety requirements to be implemented by the Government as requested at the direction of the NASA Technical manager in accordance with established NASA directives and procedures.  Exh. D, ¶1.6 -1.11.

C.    NSBRI Cooperative Subagreement with the University of Pennsylvania

NSBRI entered into a Master Cooperative Subagreement  #NCC9 -58-159 Under NASA Cooperative Agreement #NCC9-58 with the University of Pennsylvania (Penn) as Recipient to apply to any project Penn is authorized to perform and which Penn accepts during the term of the agreement, which commenced with the Effective Date of October 1, 2000.  Exh. E.

The Subagreement includes a section titled Safety and Health requiring Penn to take all reasonable safety and health measures in performing under the Cooperative Agreement and to comply with laws, standards, specifications, requirements as indicated in the Subagreement  Exh. E.

In March 2001, the Director of the Environmental Health & Radiation Safety Office of the University of Pennsylvania executed an Affirmation of Safety Program affirming, inter alia, the following:

> This organization has an existing safety program consistent with the NASA Guidelines referenced in the NSBRI Safety and Health Plan and in compliance with appropriate federal, state and local regulations, as required by the Occupational Safety and Health Act. This organization has reviewed the NSBRI-BCM [Baylor College of Medicine] safety and health plan described in the foregoing document and certifies that it has effective health and safety procedures, comparable to those of BCM, and that it will perform the obligations required of it, as described in the foregoing document. Hazards have been identified, eliminated and/or controlled and research may only be performed under safe conditions.
> …

The Affirmation is included as part of the NSBRI Safety and Health Plan. See Exh. D at p. 10.

D. NSBRI/NASA Research Solicitations

NSBRI participates in research solicitations with NASA. The Institute solicits ground-based research projects from the entire biomedical research community annually through open solicitations that are coordinated with, and approved by, NASA (Exhibit F, Strategic Plan 2003, page 8, Strategic Plan 2010, page 7). As a result, NSBRI science staff and management are behind the government firewall. Specifically, the Institute's science staff and management are behind the firewall for federal procurement for NASA's Human Research Program. NSBRI senior management is part of the confidential federal planning, programming, budgeting and executive process.

On February 11, 2008, following a period of preparation and coordination between NSBRI and NASA, NSBRI issued a Request for Applications (RFA) soliciting proposals for an NSBRI Center of Acute Radiation Research (CARR), as part of the NSBRI Radiation Effects

Team and in support of the NASA's Human Research Program (HRP) and the Space Radiation Program Element (SRPE). Exh. G. The NSBRI RFA solicited ground-based proposals organized as a CARR addressing Acute Radiation Effects associated with solar particles. Exh. G, p. 4,6. Applicants were required to be registered with NASA Solicitation and Proposal Integration Review and Evaluation System (NSPIRES) and submit their proposals using the NSPIRES system. Exh. G, p. 3-4.

As described in the RFA, NASA and NSBRI were concerned with the health risks for astronaut exposure to solar particle events (SPE), and the NSBRI-CARR program was expected to enhance NSBRI and NASA's base of scholarship, skills, and performance in the space biological and biomedical sciences and related technological areas. Exh. G, p. 7, 9. ¶ F.

The RFA includes a description of the Structure of the NSBRI-CARR as including interactions among Investigators, University Partners, NSBRI and NASA and indicates that the proposal must indicate how the CARR will maintain communication with the appropriate team leads, discipline leads and managers at NSBRI and NASA. Exh. G, p. 11,¶ H, 1.

The RFA includes a section titled "NASA Safety Policy" stating as follows:

> Safety is NASA's highest priority. Safety is the freedom from those conditions that can cause death, injury, occupational illness, damage to or loss of equipment or property, or damage to the environment. NASA's safety policy is to protect: (1) the public, (2) astronauts and pilots, (3) the NASA workforce (including employees working under NASA instruments), and (4) high-value equipment and property. All research conducted under NSBRI shall conform to this policy.

Exh. G, p. 14, §J.

A Proposal was submitted through NSPIRES by the Trustees of the University of Pennsylvania as the Submitting Organization with Ann Kennedy, D.Sc. as the Principal Investigator ("the Penn Proposal"). All proposals were sent for peer review, which was

coordinated by NASA Research and Education Support Services (NRESS), following which the highest scoring proposals were discussed by members of the NSBRI External Advisory Council.

The selection recommendation was the Penn Proposal, which was discussed with and concurred in by NASA. In August 2008, Dr. Kennedy was notified that the Penn Proposal was selected for funding. Exh. H. The August 18, 2008 letter advised Dr. Kennedy of NSBRI's cooperative agreement with NASA; of the expectation that Dr. Kennedy would work closely with the technical representatives from NSBRI and NASA; of the annual CARR review and report to assess productivity and progress, and of the CARR Scientific Advisory Committee, consisting of NSBRI, NASA and external scientific experts, assigned to review annual progress of the CARR research program. Exh. H.

A NSBRI/NASA Space Radiation Liaison was assigned to the CARR project to serve as a point of contact and to provide coordination between and among CARR, NASA and NSBRI and to assure integration of NSBRI and NASA efforts. Affidavit, J. Sutton.

## IV. LEGAL ARGUMENT

Defendant NSBRI removed this action, *inter alia*, pursuant to 28 U.S.C. § 1442(a)(1), which provides:

> § 1442. Federal officers or agencies sued or prosecuted
>
> (a) A civil action or criminal prosecution that is commenced in a State court and that is directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:
>
> (1)     The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of revenue.

10

NSBRI is not and does not claim to be a federal officer or agency. The statute, referred to as the federal officer removal statute, permits a person acting under a federal officer to remove to federal court any action brought against him in state court for conduct performed under federal direction. *Fiedt v. Owens Corning Fiberglas Corp.*, 153 F.3d 124, 127 (3d Cir. 1998). To establish removal jurisdiction pursuant to section 1442(a)(1), defendant NSBRI must establish that (1) it is a "person" within the meaning of the statute; (2) the plaintiff's claims are based upon the defendant's conduct "acting under" a federal officer; (3) it raises a colorable federal defense; and (4) there is a causal nexus between the claims and the conduct performed under the color of a federal office. *Feidt v. Owens Corning Fiberglass Corp.,* 153 F. 3d 124, 127 (3d Cir. 1998), citing *Mesa v. California,* 489 U.S. 121, 129, 109 S.Ct. 959, 965, 103 L.Ed 2d 99 (1989); *Willingham v. Morgan*, 395 U.S. 402, 409, 89 S. Ct. 1813, 1817, 23 L.Ed. 2d 396 (1969). In *Feidt,* defendant Westinghouse Electric Corporation removed the action pursuant to the federal officer removal statute. The plaintiff filed suit claiming exposure to asbestos products while working about the U.S.S. Enterprise. The district court remanded the case concluding that Westinghouse failed to establish the causal connection between the conduct upon which plaintiff's claim was based and Westinghouse's federal military contract obligations. The Third Circuit did not address the merits of the removal or remand, focusing solely on its jurisdiction to review the remand order. Finding jurisdiction lacking, the appeal was dismissed for lack of jurisdiction.[4]

In support of the Motion for Remand, Plaintiff argues that NSBRI is an independent, non-profit entity; that NSBRI cannot be seen as standing in the same stead as NASA; that NASA is not referenced in NSBRI's website as having any ongoing management or operational role; that

---

[4] Subsequent to the Feidt decision, 28 USCS § 1447 was amended to provide for appellate review of remand orders as to matters removed pursuant to §1442. See, §1447(d).

there is no nexus or causal connection between the alleged conduct of NSBRI, and that NSBRI is not NASA and does not act for NASA. Further, plaintiff states: "the mere fact that Defendant NSBRI receives some funding from a federal agency – much like most hospitals in America, for example- does not mean any action against NSBRI is a case against a federal agency."

Plaintiff misconstrues the requirements for establishing removal under 28 U.S.C. § 1441(a)(1) and misstates NSBRI's relationship with NASA. The rule that removal statutes are to be strictly construed, does not apply to the federal officer removal statute. As stated in *Hagen v. Benjamin Foster Co.*, 739 F.Supp. 2d 770, 777, "the Court must broadly construe Defendant's ability to remove under Section 1442(a)(a) as to avoid frustrating its policy objective of 'hav[ing] the validity of the defense of official immunity tried in federal court' by applying a 'narrow, grudging interpretation.'" [citations omitted].

In *Watson v. Phillip Morris Companies, Inc.*, 551 U.S. 142, 127 S.Ct. 2301 (2007), the Court addressed the federal officer removal statute in the context of a lawsuit against Phillip Morris for advertising certain cigarettes as "light". The district court upheld the removal, finding that the complaint attacked Phillip Morris' use of the Government's method of testing cigarettes, and holding that Phillip Morris was sued for acts taken under the Federal Trade Commission (FTC). The Eight Circuit affirmed, emphasizing the FTC's detailed supervision of the cigarette testing process. The Supreme Court disagreed and reversed the judgment of the Eighth Circuit, stating that a private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official". 551 U.S. 153, 127 S.Ct. 2308. In arriving at its conclusion, the Supreme Court explored the history of the federal officer removal statute and precedent, noting some of the purposes of the statute including *Willingham v. Morgan*, 395 U.S. 402, 407, 89 S.Ct.

1813 (1969)("[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court") and *Jefferson County v. Acker*, 527 U.S. 423, 447, 119 S.Ct. 2069 (1999)(Scalia, J. concurring in part and dissenting in part)(noting that "the main point" of the federal officer removal statute "is to give officers a federal forum in which to litigate the merits of immunity defenses"). *Watson,* at 150-151.

The Court also distinguished lower court cases that held that Government contractors fall within the terms of the federal officer removal statute. The Court stated that "the private contractor in such cases is helping the Government to produce the item that it needs. The assistance that private contractors provide federal officers goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks." *Watson*, at p. 153-154.

In *Isaacson v. Dow Chemical Co.*, 517 F.3d 129 (2nd Cir. 2008), the Second Circuit upheld the removal under the federal officers removal statute by defendant chemical companies who contracted with the Government to produce Agent Orange for military use in the Vietnam War. Because the defendants were not federal officers, they were required to satisfy the three-pronged test: (1) they must be 'person[s]" within the meaning of the statute "acting under" a federal officer; (2) they must show that the acts complained of were taken under color of federal office, and (3) they must raise a colorable defense. 517 F. 3d at 135.

The Court found that the corporate persons were "persons" under the statute, noting that its finding was in agreement with the Fifth Circuit and several district courts. Addressing the "acting under" prong, the Court stated that the words "acting under" are to be interpreted broadly. Referring to *Watson*, 127 S.Ct. 2301, 2307, the Court stated that an entity "act[s] under" a federal officer when it "assist[s], or … help[s] carry out, the duties or tasks of the federal superior." "In other words, there must exist a 'special relationship' between the two."

*Id.*  The Court concluded that by contracting with the Government to provide a product that the Government was using during war – which in the absence of Defendants the government would have to produce itself, Defendants had the "special relationship" required by the "acting under" prong.

For the second prong, which the Court referred to as the causation prong, Defendants had to show that the acts complained of – producing dioxin through the manufacture of Agent Orange – were taken "under color of" federal office.  The Second Circuit determined that the hurdle erected by this requirement is quite low, and found it satisfied, stating: "To show causation, Defendants must only establish that the act that is the subject of Plaintiffs' attack (here the production of byproduct dioxin) occurred *while* Defendants were performing their official duties. See *Willingham*, 395 U.S. at 409."   The Court further stated that "whether the challenged act was outside the scope of Defendants' official duties, or whether it was specifically directed by the federal Government, is one for the federal – not state – courts to answer.  See *Willingham*, 395 U.S. at 409."  *Isaacson*, 517 F. 3d at 137-138.   See also, *Bennett v. MIS Corporation*, 607 F.3d 1076 (6th Cir. 2010)(Suit for cross-contamination against mold remediation contractors hired by the Federal Aviation Administration removed to federal court under federal officer removal statute; in addressing causation prong, Court found nexus was established because the remediation work was done at the direction of FAA officers under contract, further noting "it is sufficient for our purposes that MIS's execution of the FAA contracts gave rise to the alleged cross-contamination).

For the final prong, a colorable federal defense, the Court in *Isaacson* found that the Defendants raised a colorable government contractor defense.  In the context of that case, involving Agent Orange, the government contractor defense would protect a government

14

contractor from liability under state tort law when the Government approved the product's

general design, the product conformed to that design, and the contractor warned the Government

of the risks of the product. The Court stressed that to be "colorable", the defense need not be

"sustainable", as the purpose of the removal statute is to secure that the validity of the defense

will be tried in federal court. [citation omitted]. 517 F.3d at 139. See also, *Bennett v. v. MIS*

*Corporation*, 607 F.3d 1076 (6th Cir. 2010)(Finding government contractor defense to be

colorable in non-military performance contract context and stating that focus is not on whether

MIS would succeed at trial, but only whether for removal purposes, MIS raises a colorable claim

to it.) In *Hudgens v. Bell Helicopters/Textron*, 328 F.3d 1329 (11th Cir. 2003), which did not

involve the federal officer removal statute, the government contractor defense was extended to a

maintenance contract. Similarly, in *Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir. V.I.

1993), not involving removal, the Third Circuit extended the government contractor defense to

non-military procurement contracts, relying on *Boyle v. United Technologies Corp.*, 487 U.S.

500, 507-08, 108 S. Ct. 2510, 2515-16, 101 L. Ed. 2d 442 (1988), and stating:

> A private contractor who is compelled by a contract to perform an obligation for
> the United States should, in some circumstances, share the sovereign immunity of
> the United States. ... "The liability of independent contractors performing work
> for the Federal Government . . . is an area of uniquely federal interest." Id. at 505
> n.1, 108 S. Ct. at 2515 n.1. The imposition of liability on an independent
> contractor who enters into a procurement contract with the United States directly
> implicates the significant federal interest in the completion of the government's
> work. See id. at 505, 108 S. Ct. at 2515. That significant federal interest exists
> regardless of whether the procurement contract is military or nonmilitary in
> nature.

In this matter, NSBRI satisfies all of the prongs of the test under the federal officer

removal statute. The facts clearly demonstrate that NSBRI's relationship with NASA was a

"special relationship" and that NSBRI was performing a service for NASA that NASA would

otherwise have to perform. NSBRI is a "person" "acting under" NASA. The alleged acts or

failure to act on the part of NSBRI complained of in Plaintiff's Complaint, such as failing to assure proper radiation precautions were taken to protect Dr. Ware, as alleged, should have occurred as part of NSBRI's role under the Cooperative Agreement with NASA, thereby satisfying the "under color of" requirement.

Defendant NSBRI has raised the government contractor defense in support of its removal. The facts establish that NSBRI is the focal point of NASA sponsored space biomedical research. There is a NASA Technical Officer authorized to represent NASA in discussions regarding NSBRI activities and to approve or disapprove NSBRI reports or technical information submitted to NASA. Senior NASA representatives including the NASA Technical Officer are a part of the NASA/NSBRI Steering Committee that meets on a monthly basis to discuss NASA-NSBRI activities and coordination. NASA gave direction as to the NSBRI Safety and Health Plan and approved the Plan. NSBRI acted in compliance with the Cooperative Agreement, the Management Plan, and the Health and Safety Plan. The imposition of liability on NSBRI, having entered into a cooperative agreement with NASA, directly implicates the significant federal interest in the completion of the government's work. NSBRI has a colorable federal contractor defense in this matter.

## V.    CONCLUSION

For the foregoing reasons and for the reasons set forth in co-defendants' Response to Plaintiff's Motion for Remand with Memorandum of Law, Defendants NSBRI and CARR respectfully request that Plaintiff's Motion for Remand be denied.

Respectfully submitted,

GERMAN, GALLAGHER & MURTAGH, P.C.


By: _s/ Kathryn A. Dux_
      Dean F. Murtagh, Esquire
      Attorney ID No. 19611
      Kathryn A. Dux, Esquire
      Attorney ID No. 38446
    200 S. Broad Street, Suite 500
    Philadelphia, PA 19102
    (215) 545-7700 (215) 732-4182 (Facsimile)
    Attorney for Defendants National Space
    Biomedical Research Institute and Center for
    Acute Radiation Research

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Estate of Jeffrey H. Ware, By Barbara Boyer, Individually, | ) |
| On Behalf of Wrongful Death Beneficiaries and as | ) |
| Administratrix of Estate of Jeffrey H. Ware | ) |
| VS. | ) |
| Hospital of the University of Pennsylvania,  and | ) |
| University of Pennsylvania, and Perelman School of Medicine | ) |
| University of Pennsylvania, and Trustees of the University of | ) Case No. 2:14-cv-00014-TON |
| Pennsylvania, and Ann R. Kennedy, D.S.C. and | ) |
| Gary Kao, M.D. and Michelle Alonso-Basanta, M.D., and | ) **Jury Trial Demanded** |
| National Space Biomedical Research Institute and | ) |
| Center for Acute Radiation Research | ) |

## CERTIFICATE OF SERVICE


I do hereby certify that the within Response of Defendants National Space Biomedical Research Institute and Center for Acute Radiation Research to Plaintiff's Motion for Remand with Memorandum of Law was electronically filed with the Court on February 18, 2014 and served upon counsel listed below by the Court's electronic filing :

Daniel J. Sherry, Esquire
Marshall Dennehey Warner
    Coleman & Goggin
620 Freedom Business Center, Suite 300
King of Prussia, PA  19406

Donald Jose, Esquire
Jose & Associates
108 Tramore Circle
Malvern, PA  19355

Aaron J. Freiwald, Esquire
Layser & Freiwald, P.C.
1500 Walnut Street, 18th Floor
Philadelphia, PA  19102

 */s/ Kathryn A. Dux*
Kathryn A. Dux