UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

ESTATE OF JEFFREY H. WARE                          :
*by Barbara Boyer, individually, on behalf*        :
*of wrongful death beneficiaries and as*           :
*administratrix of the Estate of Jeffrey H. Ware,* :
                                                   :
                    Plaintiff,                     :
                                                   :
             v.                                    :        No. 2:14-cv-00014
                                                   :
HOSPITAL OF THE UNIVERSITY OF                      :
PENNSYLVANIA;                                      :
UNIVERSITY OF PENNSYLVANIA;                        :
PERELMAN SCHOOL OF MEDICINE                        :
UNIVERSITY OF PENNSYLVANIA;                        :
TRUSTEES OF THE UNIVERSITY OF                      :
PENNSYLVANIA;                                      :
ANN R. KENNEDY, *D.S.C.*;                          :
GARY KAO, *M.D.*;                                  :
MICHELLE ALONSO-BASANTA, *M.D.*;                   :
NATIONAL SPACE BIOMEDICAL                          :
RESEARCH INSTITUTE; and                            :
CENTER FOR ACUTE RADIATION                         :
RESEARCH,                                          :
                                                   :
                    Defendants.                    :
_____

## MEMORANDUM OPINION

**Plaintiff's Motion to Withdraw and Remand, ECF No. 78 - Denied**
**Defendants' motions for summary judgment, ECF Nos. 81 and 82 - Granted**

**Joseph F. Leeson, Jr.**                                    **September 8, 2016**
**United States District Judge**

## I.      Introduction

　　Jeffrey H. Ware was a senior researcher at the University of Pennsylvania who studied the effects of radiation on living organisms. Am. Compl. ¶ 4, ECF No. 32. He died in 2011 from a rare type of brain cancer called gliosarcoma. *Id.* ¶ 6. Barbara Boyer was Ware's wife. *Id.* ¶ 2. She claims that his cancer was caused by his exposure to excessive levels of radiation during his research, and that the University of Pennsylvania and certain of its employees are responsible for failing to protect him from that radiation. *See id.* ¶¶ 177-92. She also claims that when Ware

sought treatment for his cancer at the University of Pennsylvania, he was not provided with proper medical care. *See id.* ¶¶ 193-228.

Boyer originally filed this action in the Court of Common Pleas of Philadelphia County, Pennsylvania. Defendants removed the action on the theory that federal law confers jurisdiction upon the federal courts to hear actions arising out of exposure to certain radioactive materials, and on the theory that one of the Defendants—the National Space Biomedical Research Institute ("NSBRI")—was acting under the direction of a federal officer during the events in question, *see* 28 U.S.C. § 1442(a)(1). Boyer sought to remand the action, but the Court agreed with Defendants on both theories of jurisdiction. *See Estate of Ware ex rel. Boyer v. Hosp. of the Univ. of Pa.*, 73 F. Supp. 3d 519 (E.D. Pa. 2014). Since that time, Boyer voluntarily dismissed her claims against the NSBRI, and she now moves to voluntarily dismiss certain claims against the other Defendants, without prejudice, with the goal of eliminating all bases for federal jurisdiction. Defendants oppose her motion. Defendants have also moved for summary judgment on all of Boyer's claims.[1]

Due to the late stage of the proceedings, the Court declines to permit Boyer to dismiss her claims without prejudice. That leaves Defendants' request for the entry of summary judgment. Because Defendants have established that summary judgment is warranted on all of Boyer's claims, judgment will be entered in their favor.

## II.    Procedural History

Boyer's original complaint identified twenty claims, some based on the failure to protect Ware from radiation exposure during his research and some based on the failure to provide him with proper medical treatment after he was diagnosed with cancer. All were based on state law. Nevertheless, Defendants removed the action, citing to part of the Price-Anderson Nuclear Industries Indemnity Act. *See* 42 U.S.C. § 2210(n)(2). Section 2210(n)(2) grants the district courts original jurisdiction over any "public liability action arising out of or resulting from a nuclear incident." That would seem to be a peculiar way to describe a case alleging that a researcher was injured while working on the campus of the University of Pennsylvania, but owing to the broad definitions Congress gave to the terms "public liability action" and "nuclear incident," the Court held that this case met that description and removal of the case was proper. *See Estate of Ware*, 73 F. Supp. 3d at 532-33.

Removal was also proper because one of the Defendants, the NSBRI, was acting under the direction of a federal officer during the events in question. Under 28 U.S.C. § 1442(a)(1), any

---

[1]      Defendants took it upon themselves to draft an unsolicited thirty-five-page opinion on these motions, which they proposed for the Court to adopt as its own. *See* ECF No. 85. This document appears to be designed as a vehicle for Defendants to obtain judicial endorsement of their views on a host of legal issues related to the litigation of radiation-injury lawsuits that do not need to be resolved to dispose of these motions. That is evident from the fact that only eighteen of its thirty-five pages make any reference to this case. The rest contain lengthy expositions on Defendants' views on the proper way to interpret and apply various federal statutes and regulations to personal injury lawsuits based on radiation exposure. This filing will be stricken from the record.

action against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office" may be removed. The NSBRI is not itself a federal agency but rather is a nonprofit organization that was created by the National Aeronautics and Space Administration to conduct space biomedical research. *See Estate of Ware*, 73 F. Supp. 3d at 535. Boyer joined the NSBRI as a defendant to this case because she claimed that the research Ware was conducting was funded in part by a grant from the organization. After reviewing the relationship between the NSBRI and NASA, the Court concluded that the NSBRI was acting under NASA's direction during the events in question, which meant that NSBRI's presence in the case supplied a second basis for federal jurisdiction. *See id.* at 535-39.

After Boyer's request to remand the case was denied, she amended her complaint. She replaced her state law negligence claims with two claims styled as, "Negligence Action under Price Anderson Act" (one against one group of Defendants and one solely against the NSBRI[2]), accompanied by four other state law claims against various combinations of Defendants.

Discovery then commenced. Following extensions, the parties were to serve their expert reports by October 30, 2015, complete fact discovery by November 30, 2015, and serve their summary judgment motions by December 29, 2015.[3] On November 11, 2015, certain Defendants filed a "Motion to Determine the Duty Owed to Dr. Ware in the Price-Anderson Public Liability Action"—in effect, a motion for partial summary judgment on one element of Boyer's negligence claims. *See* ECF No. 72. Boyer did not respond. Two weeks later, on November 25, Defendants moved to compel Boyer to either produce her expert reports by a date certain—she produced none by the court-imposed deadline of October 30—or be precluded from offering any expert testimony to support her claims. *See* ECF No. 73. Boyer did not respond. On December 3, Defendants moved to compel Boyer to respond to certain of their written discovery requests that went unanswered and to produce two witnesses for depositions that Boyer's counsel had cancelled. *See* ECF No. 74.

The Court scheduled a status conference to address these motions (and Boyer's failure to respond to them), but one day before the conference, Boyer's counsel filed a letter with the Court, stating that "[a]fter several discussions with our client, our experts and a review of the relevant case law concerning Price Anderson, we have come to the conclusion that we will not submit supporting expert reports and will be withdrawing the Price Anderson claim."[4] Her counsel added that, in his view, Boyer's "remaining state-law negligence claims . . . should be remanded back to the state court for determination." On December 14, Boyer moved to voluntarily dismiss her two Negligence Action under Price Anderson Act claims without

---

[2]        Boyer also named the "Center for Acute Radiation Research" as a Defendant to that claim, but according to the NSBRI, the "Center for Acute Radiation Research" was simply a name given to a research project that the NSBRI awarded to the University of Pennsylvania, not a legal entity capable of being sued. *See* Answer of Defs.' NSBRI and Center of Acute Radiation Research ¶ 20, ECF No. 69.

[3]        *See* Order, Oct. 9, 2015, ECF No. 65; Order, July 2, 2015, ECF No. 57.

[4]        *See* ECF No. 76.

prejudice and remand the remaining claims to the Court of Common Pleas. *See* ECF No. 78. Defendants opposed the motion, both because they claimed they would be prejudiced if Boyer were permitted to voluntarily dismiss these claims without prejudice after nearly a year of discovery (and only two weeks before the deadline for the parties to move for summary judgment), and because, in their view, dismissing just these two claims would not eliminate federal subject-matter jurisdiction. Two days later, on December 16, Boyer voluntarily dismissed her claims against the NSBRI with prejudice pursuant to a stipulation signed by all of the parties.[5]

Two weeks later, Defendants filed three more partial summary judgment motions (adding to the earlier "Motion to Determine the Duty Owed to Dr. Ware"). One seeks the entry of judgment on Boyer's Negligence Action under Price Anderson Act claims as well as "all federal issues" raised by her other claims, *see* ECF No. 82, another seeks the entry of judgment on all of Boyer's other claims, *see* ECF No. 81, and the third seeks a determination of the legal standard Boyer must meet to establish the causation element of the Negligence Action under Price Anderson Act claims, *see* ECF No. 80. Granting these motions would have the effect of awarding summary judgment to Defendants on all of Boyer's claims. Boyer responded to none of them.

Together, these motions present three questions: whether Boyer should be permitted to dismiss her Negligence under Price Anderson Act claims without prejudice at this stage of the proceedings, whether dismissing those claims would deprive the Court of jurisdiction over her other claims, and whether summary judgment is warranted in Defendants' favor on any claims that remain. These issues will be taken up slightly out of order, starting with the matter of the Court's jurisdiction.

### III. Federal subject matter jurisdiction would still exist even if Boyer's Negligence Action under Price Anderson Act claims were dismissed.

As the Court has observed, subject matter jurisdiction was found to exist for two reasons: First, the Price-Anderson Act affords the federal courts jurisdiction over "any public liability action arising out of or resulting from a nuclear incident," *see* 42 U.S.C. § 2210(n)(2), and the Court found that this case fit that definition. Second, a person acting under the direction of a federal officer may remove a case related to those acts, *see* 28 U.S.C. § 1442(a)(1), and the Court found that one of the Defendants, the NSBRI, was acting under the direction of a federal officer during the events in question. Since that time, Boyer has voluntarily dismissed her claims against the NSBRI with prejudice, removing one of the bases for jurisdiction. Boyer contends that if she is permitted to dismiss two of her pending claims, that will eliminate the other.

Boyer's Amended Complaint contains six claims: two claims of negligence, each styled as a "Negligence Action under Price Anderson Act," a claim of fraud, a claim for medical malpractice, styled as "Negligence under Mcare Act," a claim for corporate negligence, and a

---

[5]        *See* Joint Stipulation to Dismiss, ECF No. 83-1. By this same stipulation, Boyer also dismissed her claims against Defendant Center for Acute Radiation Research.

claim for negligent infliction of emotional distress that Boyer has brought on her own behalf. She seeks to dismiss the two Negligence Action under Price Anderson Act claims on the theory that those two claims are solely responsible for making this a "public liability action" under the Act, and without those claims, the Court can decline to exercise supplemental jurisdiction over the remaining "state law claims." Pl.'s Mot. Withdraw and Remand 3, ECF No. 78. Boyer asserted one of these two claims solely against the NSBRI, so with the dismissal of the NSBRI from the case, only one of these claims remains.

The scope of federal jurisdiction under the Price-Anderson Act can best be understood in light of changes that Congress made to the statute in 1988. That year, Congress passed the Price-Anderson Amendments Act of 1988, which "expressly created a federal cause of action for nuclear accident claims." *In re TMI Litig. Cases Consol. II (TMI II)*, 940 F.2d 832, 835 (3d Cir. 1991). To accomplish that goal, Congress created the term "public liability action," *see* 42 U.S.C. § 2210(hh), provided that any suit that meets the definition of a public liability action "shall be deemed to be an action arising under" the Price-Anderson Act, *see id.*, and, for good measure, expressly provided for federal jurisdiction over those suits, *see id.* § 2210(n)(2).[6] Accordingly, whether a suit is a "public liability action" determines whether the suit may be heard in federal court.

Under the Act, a public liability action is defined as "any suit asserting public liability." *See* 42 U.S.C. § 2014(hh). The term "public liability," in turn, means "any legal liability arising out of or resulting from a nuclear incident," *id.* § 2014(w), and the term "nuclear incident" broadly encompasses "any occurrence . . . within the United States . . . causing bodily injury, sickness, disease, or death . . . arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material," *id.* § 2014(q). Putting these terms together, a public liability action is any suit in which a party alleges that another is subject to liability arising out of an occurrence that caused bodily injury from exposure to certain radioactive materials. A public liability action is not, therefore, a specific type of claim or legal theory, but rather a federal vehicle for "virtually all claims based upon any legal liability arising out of a nuclear incident."[7] *See TMI II*, 940 F.2d at 869 (Scirica, J.,

---

[6]     As one court observed, the jurisdictional grant in § 2210(n)(2) appears to have been unnecessary because if a "public liability action" is deemed to arise under the Price-Anderson Act, the general federal question jurisdiction statute would then provide subject matter jurisdiction over the suit. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1137 (10th Cir. 2010) ("[A]ny suit 'asserting public liability' under 42 U.S.C. § 2210 is a civil action arising under the laws of the United States over which a federal court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331."). It appears that the real work § 2210(n)(2) performs instead deals with venue. Under this subsection, upon motion, "any [public liability action] pending in any State court . . . or United States district court shall be removed or transferred to the United States district court" in "the district where the nuclear incident takes place."

[7]     The legislative history of the Price-Anderson Amendments Act of 1988 confirms that this is so. The House Committee on Interior and Insular Affairs stated that the purpose of the amendments was to "confer[] on the Federal courts jurisdiction over *all claims* arising out of nuclear incidents," which the Committee recognized was the same approach "Congress ha[d] used . . . in the Outer Continental Shelf Lands Act.'" *TMI II*, 940 F.2d at 856 (quoting H.R. Rep. No. 100-104, at 18 (1987)) (emphasis added). In the Lands Act, Congress created a federal forum for any claims arising on the Outer Continental Shelf by "declar[ing] 'the civil and criminal laws of each adjacent state to be

concurring). That means that whether a particular suit is a public liability action—and whether federal subject matter jurisdiction exists—depends not upon the type of claims that the plaintiff asserts but upon the factual circumstances underpinning those claims. *See O'Conner v. Commonwealth Edison Co*., 13 F.3d 1090, 1100 (7th Cir. 1994) (observing that a "district court must decide, in the first instance, whether the alleged injuries arise out of a nuclear incident" in order to determine whether a suit is a public liability action).

      With this understanding in mind, it is clear that neither the names Boyer gave to her claims nor the legal theories on which they are based are determinative of whether this suit is a public liability action. When Boyer initially challenged the removal of this case, the Court looked instead to the factual allegations on which her claims were based and found that this was a public liability action because at least one of Boyer's claims was seeking to hold Defendants liable for "harm [caused] to Dr. Ware as a result of radiation emitted from the Cesium-137 in the Cesium irradiator while he was working as a research scientist."[8] *See Estate of Ware*, 73 F. Supp. 3d at 532. If Boyer were to be permitted to dismiss the remaining Negligence under Price Anderson Act claim, the question would be whether any of the remaining claims seek to do the same.

      In her Negligence under Price Anderson Act claim, Boyer alleges that a number of the Defendants were negligent for failing to protect Ware from radiation emitted by the cesium-137 irradiator. That claim is not, however, the only claim in her Amended Complaint predicated on the harm Ware allegedly suffered from radiation exposure. Boyer's claim for fraud alleges that certain Defendants "willfully concealed, withheld and refused to identify and produce all data and information about Dr. Ware's exposure to radiation during his years as a research scientist" and "kn[ew] that Dr. Ware was being exposed to dangerously high levels of radiation . . . but knowingly, willfully and recklessly withheld and concealed this information," Am. Compl. ¶¶ 195-96, and that if they had disclosed this information in a timely manner, doing so "would have led to earlier diagnosis and treatment of [Ware's] brain cancer," *id.* ¶ 197. And, in her claim for negligent infliction of emotional distress, Boyer claims that she was "present and within the zone of danger as Defendants acted negligently and recklessly in disregard of her husband's safety and well-being." *Id.* ¶ 230. Based on these allegations, these two claims also arise, at least in part, out of the harm that Ware allegedly suffered from exposure to radioactive materials. That means that even if Boyer is permitted to withdraw her Negligence under Price Anderson Act claim, this suit would still be a public liability action under the Price-Anderson Act, and this Court would still have subject matter jurisdiction.[9]

---

the law of the United States' on the Outer Continental Shelf." *Id.* (quoting 43 U.S.C. § 1333(a)(2)). Under that Act, federal courts have assumed jurisdiction over a variety of types of state law claims, such as disputes over mineral rights, contract disputes, and personal injury claims. *See id.*

[8]    Boyer maintains that applying the Act to this case was incorrect, *see* ECF No. 76, but it is a settled part of the law of this case.

[9]    Defendants argue that even Boyer's medical malpractice claims "include[] federal safety issues which the defendants have an absolute right to have resolved in a federal forum." Defs.' Opp'n Mot. Withdraw and Remand 4,

This conclusion lowers the stakes of Boyer's request to dismiss the Negligence under Price Anderson Act claim and remand those that remain. Because a remand would not be possible even if that claim were dismissed, the only question is whether Boyer should be permitted to dismiss this claim without prejudice instead of having to face Defendants' summary judgment motions.

**IV.  Boyer will not be permitted to withdraw her Negligence Action under Price Anderson Act claim at this stage of the proceedings.**

Once an opposing party has answered a complaint, a claim against that party may be voluntarily dismissed "only by court order, on terms that the court considers proper." *See* Fed. R. Civ. P. 41(a)(2); *Neifeld v. Steinberg*, 438 F.2d 423, 431 (3d Cir. 1971). While there is a "liberal policy" in favor of permitting voluntarily dismissals, *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 863 (3d Cir. 1990), a party may not be permitted to do so if the opposing party will be prejudiced—at least if that prejudice amounts to more than just "the mere prospect of a second lawsuit." *Id.* Considerations include the expenses the opposing party has borne, the pendency of a dispositive motion, the moving party's diligence in bringing the motion, and the explanation the moving party offers for it. *Schandelmeier v. Otis Div. of Baker-Material Handling Corp.*, 143 F.R.D. 102, 102-03 (W.D. Pa. 1992) (D.B. Smith, J.).

According to Boyer's counsel, the decision to abandon her Negligence Action under Price Anderson Act claims came after "several discussions with [Boyer], our experts and a review of the relevant case law concerning Price Anderson." *See* ECF No. 76. The implication of this is that Boyer and her counsel concluded that they could not prevail on these claims in light of the Court's ruling, in December 2014, that the Price-Anderson Act is applicable to this case. Indeed, Boyer's counsel added that they hope to withdraw this claim "in a way that allows us to appeal this Court's decision that the Price Anderson Act applies in this case." *Id.* Had Boyer sought to withdraw the two Negligence under Price Anderson Act claims soon after that adverse ruling, she likely would have been permitted to do so. Instead, she persisted with these claims through nearly twelve months of discovery, waiting until the eve of the deadline for the parties to file their summary judgment motions before moving to dismiss them. Boyer offers no explanation for why she required twelve months to assess the ramifications of that earlier ruling.[10]

---

ECF No. 79. That seems to be a reversal of the position they took earlier in this case, when they suggested that "[i]f Plaintiff's counsel voluntarily dismisses with prejudice all claims of harm from any radiation emitted by the Cesium-137 contained in the cesium irradiator, Price-Anderson will not block remand" and that Boyer's medical malpractice claim was a "state claim" over which this Court "may exercise pendant jurisdiction." *See* Mem. Supp. Defs.' Opp'n Remand 13, 23, ECF No. 13; *see also Estate of Ware*, 73 F. Supp. 3d at 533 n.13. Because the allegations underlying Boyer's claims of fraud and negligent infliction of emotional distress supply a basis for federal jurisdiction, there is no need to address this issue.

[10]     In fact, Boyer knew as early as May 2014—nineteen months before she moved to dismiss these claims—that the Price-Anderson Act was likely to apply to this case, when United States Magistrate Judge M. Faith Angell recommended that Boyer's motion to remand the case be denied because the Price-Anderson Act provided a basis for subject matter jurisdiction. *See Estate of Ware*, 73 F. Supp. 3d 519.

All the while, Defendants were engaging in discovery. Of particular note is the fact that they retained four experts to speak specifically to whether Defendants failed to protect Ware from exposure to excessive amounts of radiation and whether that exposure may have caused his cancer—issues at the heart of these claims, and issues that may not have needed to be explored had Boyer dismissed them before discovery commenced.[11] *Cf. In re Paoli*, 916 F.2d at 829 (finding no prejudice where there was "no indication that defendants invested significant amounts of time in the specific issue" that the plaintiffs sought to remove from the case). And, there are now dispositive motions pending against these claims.

Under these circumstances, Defendants would be prejudiced if Boyer were permitted to dismiss her remaining Negligence under Price Anderson Act claim without prejudice, and she will not be permitted to do so. The remaining question is whether summary judgment is warranted on this or any other of Boyer's claims.

## V. Defendants are entitled to summary judgment on each of Boyer's claims.

Through four separate motions for partial summary judgment—one filed in November 2015 and three more filed one month later—Defendants seek the entry of summary judgment on all of Boyer's claims.[12] Courts "do not approve in general the piecemeal consideration of successive motions for summary judgment, since defendants might well normally be held to the requirement that they present their strongest case for summary judgment when the matter is first raised." *See Allstate Fin. Corp. v. Zimmerman*, 296 F.2d 797, 799 (5th Cir. 1961); *accord Brown v. City of Syracuse*, 673 F.3d 141, 147 n.2 (2d Cir. 2012) (recognizing that "successive motions

---

[11]     While, as the Court has observed, Boyer's claims for fraud and negligent infliction of emotional distress also arise, at least in part, out of allegations that Ware's cancer was caused by Defendants' failure to protect him from excessive levels of radiation, it may not have been necessary for Defendants to prove that the radiation exposure did not cause his cancer to defend against those claims.

[12]     Defendants styled these motions in a variety of ways—one a "Motion to Determine the Duty Owed to Dr. Ware in the Price-Anderson Public Liability Action," another a "Motion to Determine the Causation Test in a Price-Anderson PLA," and another still a "Motion for Summary Judgment on Price-Anderson PLA and on All Issues of Nuclear Safety in Counts Three and Four"—but in substance, each motion is seeking judgment on various claims or individual elements within those claims. The exception may be the "Motion to Determine the Causation Test," which seeks a purely legal determination of the standard that Boyer would need to meet in order to establish the causation element of her negligence claims. Anticipatory rulings on pure questions of law may be appropriate in mass tort cases, where the benefits gained from narrowing the issues and streamlining discovery justify the time and expense of adjudicating isolated legal issues in advance. *See Manual for Complex Litigation (Fourth)* § 22.634 (2004). The same cannot be said for cases where the parties and claims do not number in the hundreds or thousands, where expending effort to litigate the case piece-by-piece primarily serves to benefit the defendants by offering the possibility of an early exit from the case. This is also not the first time Defendants have attempted to import mass-tort-style case management techniques into this case. In September 2015, while discovery was still ongoing, Defendants filed a "Motion for a Case Management Order," which asked the Court to order Boyer to substantiate her claims by addressing, through expert reports or other evidence, a list of six issues the Defendants had identified. That was a request for a variant of a "Lone Pine" order—an "unconventional" procedure "designed to handle the complex issues and potential burdens on defendants and court in mass tort litigation" by "identify[ing] and cull[ing] potential meritless claims and streamlin[ing] litigation." *See* Order, Oct. 9, 2015, ECF No. 66 (quoting *In re Asbestos Prods. Liab. Litig. (No. VI)*, 718 F.3d 236, 240 n.2 (3d Cir. 2013); *In re Vioxx Prods. Liab. Litig.*, 557 F. Supp. 2d 741 (E.D. La. 2008)); *see generally Lore v. Lone Pine Corp.*, No. L-33606-85, 1986 WL 637507 (N.J. Super. Ct. Law Div. Nov. 18, 1986).

for summary judgment may be procedurally improper if the arguments in the second motion could have been raised in the first motion"). Nonetheless, the Court will consider each motion in light of the fact that they all can be adjudicated at once.

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact"—that is, that no reasonable jury could return a verdict for the nonmoving party—and that "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The parties must support their respective contentions either by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When the party moving for summary judgment does not bear the burden of proof at trial, that party thus has the choice to either "produce evidence negating an essential element of the nonmoving party's case, or . . . show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).[13] A party choosing the latter option may not simply make a "conclusory assertion that the nonmoving party has no evidence." *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 84 n.2 (3d Cir. 1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (Brennan, J., dissenting)). Instead, the moving party must "affirmatively show the absence of evidence in the record," which "may require the moving party to depose the nonmoving party's witnesses or to establish the inadequacy of documentary evidence," or, "[i]f there is literally no evidence in the record, the moving party may demonstrate this by reviewing for the court the admissions, interrogatories and other exchanges between the parties that are in the record." *Id.*

Boyer has not responded to any of Defendants' motions, but uncontested summary judgment motions cannot be granted automatically. *See* Fed. R. Civ. P. 56(e)(3) advisory committee's note to 2010 amendment (recognizing that "summary judgment cannot be granted by default even if there is a complete failure to respond to the motion"). Instead, the court must still ensure that "the motion and supporting materials . . . show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). When "the moving party does not have the burden of proof on the relevant issues, this means that the district court must determine that the deficiencies in the opponent's evidence designated in or in connection with the motion entitle the moving party to judgment as a matter of law." *Anchorage Assocs. v. V.I. Bd. of Tax Review*, 922 F.2d 168, 175 (3d Cir. 1990) (citing *Celotex*, 477 U.S. 317). If the moving party elects to present evidence of its own to negate the nonmoving party's claims, the court may deem any properly supported facts to be undisputed. Fed. R. Civ. P. 56(e)(2).

---

[13]     As the *Nissan* court observed, "[t]he first method . . . may be more commonly employed because it is easier in many cases to produce affirmative evidence negating an essential element of the nonmoving party's claim or defense that it is to show that the nonmoving party has insufficient evidence to carry its ultimate burden of persuasion at trial." 210 F.3d at 1106.

**A.      Summary judgment is warranted on Boyer's Negligence Action under Price Anderson Act claim.**

Boyer claims that a number of the Defendants negligently failed to protect Ware from being "exposed to a dose of radiation in excess of the applicable regulatory numerical dose limits, which caused him to develop cancer." Am. Compl. ¶¶ 177- 80. There is no dispute that Ware was diagnosed with gliosarcoma, a type of brain cancer. There is also no dispute that Ware worked in an environment where he may have been exposed to radiation. But while "there is scientific consensus that ionizing radiation can cause cancer, ionizing radiation . . . is not currently known to leave a tell-tale marker in those cells which subsequently become malignant." *In re TMI*, 193 F.3d at 643. As a result, "the primary basis to link specific cancers with specific radiation exposures is data that has been collected regarding the increased frequency of malignancies following exposure to ionizing radiation. In other words, causation can only be established (if at all) from epidemiological studies of populations exposed to ionizing radiation." *Id.* (citation omitted).

It is clear that Boyer's ability to prove that Ware's cancer was caused by exposure to an excessive amount of radiation during his work at the University of Pennsylvania depends upon expert testimony, but Boyer has produced none. For that reason alone, summary judgment is warranted. Defendants, for their part, have produced reports from two experts who both opine that Ware's cancer was not caused by radiation from the cesium-137 irradiator. *See* Report and Op. of David G. Hoel, at 13, ECF No. 82-6 ("I conclude with a high degree of scientific certainty that Dr. Ware's gliosarcoma was not the result of his radiation exposure while working at the University of Pennsylvania."); Report and Op. of Fred A. Mettler, Jr., at 5, ECF No. 82-7 ("My opinion is that Mr. Ware's brain cancer (gliosarcoma) was not due to radiation exposure."). For both of these reasons, Defendants are entitled to summary judgment on this claim.

**B.      Summary judgment is warranted on Boyer's claim for negligence under Pennsylvania's Medical Care Availability and Reduction of Error Act.**

After Ware was diagnosed with gliosarcoma, he sought treatment at the Hospital of the University of Pennsylvania. Boyer claims that the care Ware received did not meet the appropriate standards of care. For example, she claims that the Hospital and various physicians failed to "provide treatment that was reasonably related to improving Dr. Ware's prospects for a quality of life" and failed to "recognize that radiation therapy was contra-indicated given Dr. Ware's particular brain cancer type." Am. Compl. ¶ 211.

In addition to not providing any expert reports to connect Ware's cancer to his exposure to radiation, Boyer has also not produced any expert reports to support her allegations that the treatment Ware received for his cancer fell below the appropriate standard of care. That defeats this part of her claim. Without expert evidence, Boyer cannot show that the treatment Ware received was deficient "[b]ecause the negligence of a physician encompasses matters not within the ordinary knowledge and experience of laypersons." *Toogood v. Rogal*, 824 A.2d 1140, 1145

(Pa. 2003). While there is a "very narrow" exception to this requirement for those cases "where the matter is so simple or the lack of skill or care so obvious as to be within the range of experience and comprehension of even non-professional persons," *see id.* at 1145 (quoting *Hightower-Warren v. Silk*, 698 A.2d 52, 54 n.1 (Pa. 1997)), such as the "'sponge left in the patient' cases," *see id.* at 1147,  this is not one of those cases. Without expert testimony, a jury could not determine whether there were alternative treatments available for Ware's type of cancer that could have "improve[ed] [his] prospects for a quality of life" or whether the type of radiation therapy he received should not have been administered for his type of cancer. Aside from Boyer's failure to produce any expert reports, Defendants have produced the report of a physician and professor at Johns Hopkins School of Medicine, who opined that Ware received the "optimal standard of care" for his particular type of cancer. *See* Defs.' Mot. Summ. J. Ex. A, ECF No. 81.

During his treatment, Ware was enrolled in an "imaging study" for the purpose of "study[ing] the effects of chemotherapy and radiation on brain cancer patients." Am. Compl. ¶¶ 122-24.  Boyer claims that Ware did not give his informed consent to participate in this study because he was not informed of "the risks, benefits and alternatives to enrolling in the experimental research protocol, including the risks of profound brain damage from the radiation and the alternative of having no radiation therapy at all." *Id.* ¶ 211(g). She also claims that Defendants withheld other information about the study, such as the fact that the University of Pennsylvania had a financial stake in the research, and that the "principle investigator" of the research study was a physician who, according to Boyer, had previously violated Nuclear Regulatory Commission regulations in connection with medical research he had performed using radioactive materials. *See id.* ¶¶ 84-116, 124-25, 214.

Boyer's lack of expert testimony forecloses her claim that Defendants failed to properly apprise Ware of the risks of participating in the study. Under Pennsylvania's Medical Care Availability and Reduction of Error Act, expert testimony is necessary to identify the risks of certain types of medical procedures, including the administration of radiation or chemotherapy, and any alternatives to those procedures and the risks those alternatives present. 40 Pa. Stat. and Cons. Stat. Ann. § 1303.504(a)-(c). As for her contention that Ware should have been informed of the University's financial interest in the study and the involvement of a physician who had run afoul of federal regulations, those allegations fall outside the scope of Pennsylvania's informed consent doctrine.[14] Under Pennsylvania common law, "the doctrine of informed consent is a limited one." *Duttry v. Patterson*, 771 A.2d 1255, 1258 (Pa. 2001). A physician need inform the

---

[14]     Under circumstances sometimes referred to as a "ghost surgery," a physician can be held liable for performing a procedure without consent if the physician who performed the procedure was not the one to which the patient consented. *See Taylor v. Albert Einstein Med. Ctr.*, 723 A.2d 1027, 1036 (Pa. Super. Ct. 1998), *rev'd in part on other grounds*, 754 A.2d 650 (Pa. 2000) (quoting *Grabowski v. Quigley*, 684 A.2d 610, 617 (Pa. Super. Ct. 1996)). Here, however, Boyer does not claim that this other physician treated Ware without his knowledge. Rather, Boyer claims only that he was the "principle investigator" of the study. Indeed, according to Boyer, this physician "never attended any appointments with Dr. Ware." Am. Compl. ¶ 134.

patient only of "the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results." *Id.* at 1258-59 (quoting *Gray v. Grunnagle*, 223 A.2d 663, 674 (Pa. 1966)). The Medical Care Availability and Reduction of Error Act slightly broadened the scope of this doctrine by permitting a physician to be held liable "if the physician knowingly misrepresents to the patient his or her professional credentials, training or experience," *see* § 1303.504(d)(2), but Boyer is not suggesting that any physician who treated Ware misrepresented his or her credentials or experience.[15]

Finally, Boyer contends that Ware lacked the capacity to consent to this study because "he was already cognitively impaired from the ravages of his brain cancer and the craniotomy surgery he had already undergone." Am. Compl. ¶ 211(h).[16] However, Defendants' expert reviewed Ware's medical records and observed that Ware's cognition was assessed twice during his treatment—with one of those assessments taking place approximately ten days prior to the date that Ware enrolled in the study[17]—and neither assessment revealed any "concern about competence or disability that would preclude [Ware from] consenting to [the] study." Defs.' Mot. Summ. J. Ex. A. Without evidence to the contrary from Boyer, Defendants are entitled to summary judgment on this claim.

## C.    Summary judgment is warranted on Boyer's fraud claim.

Boyer claims that the Defendants who failed to protect Ware from being exposed to excessive levels of radiation also committed fraud. She claims that they "willfully concealed, withheld and refused to identify and produce all data and information about Dr. Ware's exposure to radiation during his years as a research scientist" and that if they had timely disclosed this information, it "would have led to earlier diagnosis and treatment of [his] brain cancer and would have led to a more favorable outcome in terms of his treatment, pain and suffering and life expectancy." Am. Compl. ¶¶ 195-99. These allegations do not sound in fraud, because they do not suggest that Defendants "intended to mislead [Ware] in any way." *See Bortz v. Noon*, 729 A.2d 555, 561 (Pa. 1999). Even if they did, these Defendants are entitled to summary judgment on this claim for the same reason they are entitled to summary judgment on Boyer's Negligence under Price Anderson Act claim: she has not presented evidence to show that Ware's cancer was

---

[15]    Boyer has also asserted a claim for fraud based on these and other allegations. Whether these allegations are actionable under that theory will be addressed in connection with the discussion of that claim. *See Duttry*, 771 A.2d at 137 (suggesting that a patient who cannot make out a claim under the doctrine of informed consent "may have a cause of action for misrepresentation").

[16]    Boyer included this allegation under her claim entitled "Negligence under [the Medical Care Availability and Reduction of Error] Act," but the Act has no applicability to a claim that a patient was not competent to consent. The Act deals only with "informed consent" claims—that is, claims alleging that a physician did not disclose the pertinent risks associated with a procedure and the alternatives to it, or that a physician misrepresented his or her credentials or experience. *See* § 1303.504(d). A claim that a patient lacked the capacity to consent is one for common law battery. *See Pollock v. Feinstein*, 2007 PA Super 42, ¶ 7 n.2 (Pa. Super. Ct. 2007). Nonetheless, to avoid elevating form over substance, Boyer's claim will be considered for what it is.

[17]    *See* Am. Compl. ¶ 122.

caused by his exposure to radiation during his work. Without that casual link, Boyer cannot establish that the failure to provide Ware with additional information about his radiation exposure caused him any harm. *See id.* at 500 (recognizing that recovery depends upon showing that the injury claimed was proximately caused by relying on the defendant's misrepresentation).

Boyer also claims that the Hospital and the three doctors engaged in fraud for essentially the same reasons she contends that they enrolled Ware in the imaging study without his informed consent. She claims that they "concealed and withheld information from Dr. Ware and his family" concerning the University of Pennsylvania's financial interest in the study, the involvement of the physician who had previously run afoul of federal regulations, and the "true risks and the reasonable alternatives" to participating in the study. *See* Am. Compl. ¶¶ 200-05. Even if Boyer could establish that Ware would not have agreed to participate in the study if he had learned these things, she has not produced any evidence that these omissions caused him any harm. Defendants' expert opined that the study caused Ware no harm because the study consisted of nothing more than "standard MRI imaging" that did not alter the direction of Ware's treatment for his cancer, and Ware had no adverse reactions to the imaging itself. Defs.' Mot. Summ. J. Ex. A. Boyer did not produce any evidence to the contrary, and her inability to trace Defendants' alleged omissions to any harm that Ware suffered defeats her fraud claim. *See Wooding v. United States*, 374 F. App'x 309, 312 (3d Cir. 2010) (holding that summary judgment was properly granted on a patient's claim of fraud because the patient failed to "show that his injuries were proximately caused by his reliance on [the physician's] misrepresentations").[18]

### D.   Summary judgment is warranted on Boyer's claims of corporate negligence and negligent infliction of emotional distress.

The claims that remain are Boyer's claim for corporate negligence against the Hospital of the University of Pennsylvania and her claim of negligent infliction of emotional distress against all of the Defendants. Her claim for corporate negligence is based solely on allegations that the Hospital failed to maintain proper policies and procedures to prevent the medical malpractice and informed consent violations that Boyer has failed to substantiate (and an additional allegation that the Hospital failed to select and retain competent physicians). *See* Am. Compl. ¶ 225. A hospital can be held liable only if its "negligence [was] a substantial factor in bringing about the harm to the injured party," *Thompson v. Nason Hosp.*, 591 A.2d 703, 708 (Pa. 1991),

---

[18]   In *Wooding*, the patient contended that he could prevail simply by showing that he would not have consented to the procedure had the misrepresentation not been made. 374 F. App'x at 312. The court held that under Pennsylvania law, such a claim sounds in the doctrine of informed consent, not fraud, and would therefore be compensable—if at all—under that theory of liability. *See id.* Because the patient's allegations were not sufficient to sustain an informed consent claim, the court held that the patient could not recover. *See id.* The same is true for Boyer's allegation that Ware "would not have agreed to be part of [the] experimental research protocol" if he had been apprised of this information. Am. Compl. ¶ 204. That is not sufficient to sustain a claim of fraud, and, as the Court has already observed, nor can that sustain a claim under the doctrine of informed consent.

and with no showing that Ware suffered any harm from the treatment he received, Boyer cannot prevail against the Hospital.

With Boyer unable to prevail on any of her underlying tort claims, she also cannot prevail on her claim for negligent infliction of emotional distress. *See Maldonado v. Walmart Store No. 2141*, No. 08-3458, 2011 WL 1790840, at *16 (E.D. Pa. May 10, 2011) (Restrepo, J.) ("In order to maintain a claim for negligent infliction of emotional distress, there must be an underlying tort.").

**VI.      Conclusion**

At this stage of the proceedings, Defendants would be prejudiced if Boyer were permitted to withdraw her Negligence under the Price Anderson Act claim, so her motion to voluntarily dismiss those claims is denied. Her motion to remand the remaining claims is thus denied as well—though a remand would not have been possible even if she had been permitted to withdraw those claims. Finally, Boyer has failed to produce evidence to withstand Defendants' uncontested summary judgment motions on any of her claims. Accordingly, judgment will be entered in Defendants' favor.


BY THE COURT:


*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge

14